

2000 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

10-10-2000

# Elcock v. Kmart Corp

Precedential or Non-Precedential:

Docket 98-7472

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2000

Recommended Citation

"Elcock v. Kmart Corp" (2000). *2000 Decisions.* Paper 215.
http://digitalcommons.law.villanova.edu/thirdcircuit_2000/215

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2000 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

Filed October 10, 2000

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

NO. 98-7472

CARMELITA ELCOCK

v.

KMART CORPORATION, Appellant

On Appeal From the District Court
of the Virgin Islands
(D.C. Civ. No. 1996/28 F)
District Judge: Honorable Raymond L. Finch, Chief  Judge

Argued: December 7, 1999

Before: BECKER, Chief Judge, SCIRICA and GARTH,
Circuit Judges.

(Filed October 10, 2000)

        ANDREW C. SIMPSON, ESQUIRE
         (ARGUED)
        Bryant, Barnes & Simpson, P.C.
        47 King Street, 2nd Floor
        Christiansted, St. Croix
        USVI 00820

        Counsel for Appellant

          LEE J. ROHN, ESQUIRE
          MAURICE CUSICK, ESQUIRE
          K. GLENDA CAMERON, ESQUIRE
           (ARGUED)
          Law Office of Lee J. Rohn
          1101 King Street, Suite 2
          Christiansted, St. Croix
          USVI 00820

          Counsel for Appellee

OPINION OF THE COURT

BECKER, Chief Judge.

This is an appeal by defendant Kmart from a judgment entered on a $650,000 jury verdict in favor of plaintiff Carmelita Elcock ("Elcock") for personal injuries and economic loss that she suffered as the result of a slip and fall at a Kmart store in Frederiksted, U.S. Virgin Islands. Kmart concedes its liability and acknowledges that Elcock's fall caused her some quantum of harm. However, Kmart challenges several evidentiary rulings that relate to the proof of Elcock's damages, and contends that the $650,000 award, which consisted of $300,000 for pain and suffering and $350,000 for loss of future earnings and earning capacity, was excessive.

The most important questions on appeal relate to the testimony of Dr. Chester Copemann, who was proffered by Elcock, inter alia, as an expert in vocational rehabilitation, and whose vocational rehabilitation presentation substantially informed the large award for loss of future earnings and earning capacity. We conclude that there should have been a Daubert hearing prior to the receipt of Copemann's testimony, and that because there was no such hearing, his testimony cannot stand. In the course of reaching this conclusion, we decide that the District Court did not abuse its discretion either in qualifying Copemann as an expert or in limiting the scope of cross-examination concerning Copemann's prior acts of criminal misconduct. With respect to the testimony of Dr. Bernard Pettingill, an

2

economist put on by Elcock to assess her lost future earnings, we conclude that his opinion should have been excluded because his economic model relied on assumptions wholly without foundation in the record. In the absence of the testimony of these two critical witnesses, and given the inability of Elcock's other witnesses to act as surrogates therefor, the economic loss portion of the jury verdict, which rests on this inadmissible evidence, must be set aside, and a new trial granted.

Kmart also submits that both the economic and non-economic portions of the jury award were excessive and thus should be remitted. We do not reach Kmart's remittitur arguments. Because we find that the jury's tainted economic damage award was not clearly distinct and separate from the non-economic portion of its damage verdict, a new trial must be had on all aspects of the damage award. We do, however, for the guidance of the District Court on remand, reject Kmart's contention that Elcock failed to present sufficient evidence to show that her damages, particularly her permanent injuries, were caused by her slip and fall, as we are satisfied that there is sufficient evidence in the record to support such a finding. We thus affirm in part, vacate in part, and remand for a new trial on the issue of damages.

I. Facts and Procedural History

On August 12, 1995, Elcock and her husband went to the Frederiksted Kmart to purchase mints. While shopping, Elcock slipped and fell on a waxy substance that had built up on the floor. Elcock reported her fall to customer service, and a Kmart employee placed her in a wheelchair. Elcock told Kmart representatives that she had injured her back and right leg and was in excruciating pain. Kmart offered her the opportunity to visit a physician of her choice at its expense, but informed her that it would pay for only one visit.

Elcock declined the offer and visited her own doctor, Dr. Arakere B. Prasad. Prasad diagnosed her as suffering from a lumbar sprain. Because Elcock complained of low back pain and cramps in her right leg, Prasad prescribed

3

painkillers for her. Elcock, however, never used the prescription. Prasad stated that Elcock's back and leg injuries would interfere with her flexibility and cause her pain, and that her injury was "an ongoing thing. It may be forever."

Elcock sought a second opinion from an orthopedist, Dr. Claudius Henry. During her initial visit, four days after the slip and fall, Henry also diagnosed Elcock with a low back sprain. He found limitation in Elcock's range of motion, as well as tenderness and irritation in her right leg and back "in the right LV-3 which is lumbar third to LV-1 which is the paraspinal along the spine on the right side." He considered both symptoms to be indicative of nerve root irritation arising out of an injury to muscles, ligaments, and the outer portion of the disc area in Elcock's back. Henry prescribed physical therapy, x-rays, and an anti-inflammatory drug, and recommended that Elcock limit her physical activity. The x-rays revealed that she had "minimal spurring [i.e., the accretion of calcium deposits in] the anterior portion of the vertebral bodies of the lower back." In Henry's opinion, this preexisting condition made her more susceptible to suffering a low-back sprain when she slipped and fell.

During a second visit, Henry diagnosed Elcock with resolving post-traumatic radiculopathy. Radiculopathy is often caused by a herniated intervertebral disc. Henry noted that Elcock suffered pain and nerve irritation, and complained of a limited range of motion in her back and right leg. He described these injuries as "chronic," meaning that they could "exist off and on for an indefinite period," possibly for the rest of Elcock's life. The two visits with Henry took place over a span of seven months. During this time and in the months thereafter, Elcock also saw a Dr. Ali once a month; Ali had been treating her for an unrelated diabetes condition. As evidenced by Ali's notes, Elcock never made any mention of her back and leg pain to him.

Elcock claimed that the injuries she received as a result of the fall profoundly impacted her life. At the time of the accident, Elcock was fifty-one years old and self-employed as a salesperson for Mary Kay Cosmetics. Elcock contended that she suffered extreme and uninterrupted physical pain,

4

as well as depression that often caused her to cry until her eyes became swollen. She reasoned that this depression arose in large part from the fact that her debilitating injuries affected other aspects of her life. Elcock testified that she had lost most of her Mary Kay business, and that, as a result, her income fell from the $5,744 she earned in 1995 to $1,070 in 1996. Mary Kay sells its products through a force of salespeople organized in a pyramid structure. The salespeople earn commissions and prizes on their sales and the sales of those they recruit into their personal pyramids. Elcock was thus not only responsible for selling Mary Kay's products, but for recruiting and maintaining a subordinate sales force. She stated that her injuries interfered with her ability to perform all of these functions.

Seventeen months after the slip and fall, Elcock visited Dr. Sylvia Payne, a San Juan-based specialist in physical medicine and rehabilitation, so that Payne might give an opinion as to Elcock's medical condition in relation to the fall for purposes of this litigation. Payne found that Elcock suffered from lumbar myositis (inflammation of the lower back muscles, characterized by pain, tenderness, and sometimes spasms in the affected area) and from two "trigger points" in the gluteus maximus muscle. Trigger points, according to Payne, are "very tiny point[s] in the muscle believed to be part of a muscle spindle that is firing constantly and causing pain at the sight [sic] and causing pain in another area not anatomically related." Payne testified that the trigger points were responsible for the pain Elcock felt radiating down her right leg to her knee. Payne also concluded that Elcock's "pain was severe and it interfered with several of her activities," that Elcock would be in pain for the rest of her life because of her fall, and that the injuries resulting from the fall were permanently disabling.

Elcock was also referred to Copemann, a psychologist and purported expert in vocational rehabilitation. A vocational rehabilitationist assesses the extent of an individual's disability, evaluates how the disability affects the individual's employment opportunities, and assists the individual's re-entry into the labor market. Copemann

5

examined Elcock for the purposes of this litigation, but also treated her for her chronic pain. As part of his examination, he diagnosed Elcock's psychological condition and evaluated her lost earning capacity in light of her physical and psychological disabilities. Copemann concluded that Elcock suffered from depression, pain disorder, and adjustment disorder with anxiety, and opined that these symptoms were caused by her slip and fall and the physical injuries that arose therefrom. Copemann also concluded that Elcock's psychological condition was improving and was not permanent. Based on his assessment of Elcock's psychological condition, the extent of her physical injuries, relevant employment factors, and the results of diagnostic tests he had performed, Copemann opined that Elcock was between 50 and 60 percent vocationally disabled and that this disability was permanent.

Except for Ali, all of the doctors mentioned above testified at Elcock's four-day jury trial, as did Elcock and her husband. Elcock also offered the testimony of Pettingill, who gave an expert opinion as to Elcock's lost earning capacity. The jury found for Elcock on all elements of her tort claim and awarded her $650,000 in damages: $350,000 for her economic injuries, and $300,000 for her pain and suffering. Kmart moved for judgment as a matter of law, for a new trial, or alternatively, for a remittitur. The District Court denied the motion for judgment as a matter of law and for a new trial, but did remit the pain and suffering award to $115,000. Upon Elcock's motion for reconsideration, however, the Court vacated the remittitur and reinstated the jury's damage award. The District Court had jurisdiction under 28 U.S.C. S 1332. We have appellate jurisdiction pursuant to 28 U.S.C. S 1291.

II. The Evidentiary Issues Relating to Copemann's
       Qualifications

Before trial and again during trial, Kmart sought to exclude Copemann's vocational rehabilitation testimony on the grounds that he was not qualified as an expert in the field. The District Court conducted a voir dire on Copemann's qualifications, during which Copemann testified regarding his credentials, and Kmart's vocational

6

rehabilitation expert gave testimony that called those credentials into question. The District Court considered the qualifications issue raised by Kmart a "close call," but ultimately found that Copemann was qualified to testify about vocational rehabilitation.1 Kmart challenges this decision. We review the District Court's decision to qualify Copemann for abuse of discretion. See Waldorf v. Shuta, 142 F.3d 601, 627 (3d Cir. 1998).

A.

Federal Rule of Evidence 702, rescribed in the margin, governs the use of expert testimony in the federal courts.2 As explained in In re Paoli R.R. Yard PCB Litig. , 35 F.3d 717 (3d Cir. 1994) (hereinafter "Paoli II"), Rule 702 embodies three distinct substantive restrictions on the admission of expert testimony: qualifications, reliability, andfit. See id. at 741–43. Before an expert witness may offer an opinion pursuant to Rule 702, he must first be qualified by virtue of specialized expertise. See id. at 741. In Waldorf v. Shuta, 142 F.3d 601 (3d Cir. 1998), we articulated the standard for qualifying an expert:

> Rule 702 requires the witness to have "specialized knowledge" regarding the area of testimony. The basis of this specialized knowledge "can be practical experience as well as academic training and credentials." We have interpreted the specialized knowledge requirement liberally, and have stated that this policy of liberal admissibility of expert testimony

_____

1. Copemann also testified about the physical and psychological harm that Elcock suffered as a result of her slip and fall. In light of the fact
that Copemann is a formally trained and experienced psychologist, Kmart does not challenge his qualifications to render this opinion.

2. The Rule provides that

> [i]f scientific, technical, or other specialized knowledge will assist the
> trier of fact to understand the evidence or to determine a fact in
> issue, a witness qualified as an expert by knowledge, skill,
> experience, training, or education, may testify thereto in the form
of
> an opinion or otherwise.

Fed. R. Evid. 702.

> "extends to the substantive as well as the formal
> qualification of experts." However, "at a minimum, a
> proffered expert witness . . . must possess skill or
> knowledge greater than the average layman. . . ."

Id. at 625 (citations omitted).

Even under the liberal standard described in Waldorf,
Copemann's qualifications as a vocational rehabilitationist
are thin. In contending that Copemann possessed skill or
knowledge "greater than the average layman," Elcock
focuses primarily on Copemann's experience. Specifically,
Elcock points to (1) Copemann's general training in
"assessing" individuals, which he received while earning his
Ph.D. in psychology; (2) his experience, twenty years
previous, helping drug addicts reenter the workforce; (3) his
experience primarily in the last two years dealing with the
Virgin Islands Division of Workers' Compensation, which he
had advised regarding the ability of approximatelyfifty to
sixty-five disabled employees to return to their previous
jobs; (4) his past experience as an expert witness making
lost earning capacity assessments; (5) his attendance at two
seminars regarding vocational rehabilitation, and his stated
familiarity with the literature in the area; (6) his
membership in two vocational rehabilitation organizations,
both of which place no restrictions on membership; and (7)
the fact that when Copemann was in school, a degree in
vocational rehabilitation therapy was not available, but that
he received similar training nonetheless. This last fact,
Elcock argues, explains why Copemann did not possess the
degrees or formal training one would ordinarily associate
with an expert.

In response, Kmart emphasizes several factors that
significantly undermine Copemann's purported
qualifications. First, during Kmart's voir dire, Copemann
admitted that he had neither the academic training nor the
standard credentials that would ordinarily qualify one as an
expert in vocational rehabilitation. Moreover, Kmart argues
that nothing prevented Copemann from either receiving
formal training in vocational rehabilitation after he left
school or from earning a related degree or certificate while
he was in school. Second, Copemann conceded that his
experience dealing with the workers' compensation board

8

consisted primarily of diagnosing whether patients were so disabled that they could not return to a particular job; this experience did not include assessing what range of jobs those injured individuals were capable of performing. Third, Kmart adduced evidence suggesting that not only was Copemann's experience as a counselor for drug addicts dated, but that it did not include performing assessments of which jobs the recovered addicts would be able to perform. Fourth, although Copemann maintained that there was no difference between a psychologist and a vocational rehabilitationist, Kmart's vocational rehabilitation therapist testified that despite a common psychological diagnostic component in both jobs, the vocational rehabilitationist's expertise entails a distinct speciality: the capacity to "translate" psychological and physical impairments into the "ability to work, earn income, [and] get a job . . . ."[3]

Kmart's forceful argument all but persuaded the District Court. Given Copemann's lack of credentials and limited experience, the District Court twice expressed its reluctance to qualify Copemann as an expert in vocational rehabilitation. However, after two attempts by Elcock's counsel to qualify him, the Court eventually admitted Copemann's testimony. The Court relied heavily on the fact that a formal degree in vocational rehabilitation therapy was not available when Copemann attended school, and the fact that the training of psychologists was functionally similar to that of vocational rehabilitationists at the time. The Court also relied on Copemann's practical experience evaluating the ability of injured employees to return to work.

_____

3. In support of this latter point Kmart cites Terry v. Mathews, 427 F. Supp. 464 (E.D. Pa. 1976), in which the district court remanded an administrative law judge's ("ALJ") decision to deny a social security claimant benefits because the ALJ gave great weight to the vocational rehabilitation opinion of a trained psychologist with "some limited experience in occupational therapy and counseling." Id. at 466. The district court reasoned that "the issue here is not a psychological one. Rather it is a question of expertise in the vocational field. . . . [I]n light
of [the expert's] qualifications as a psychologist, as opposed to any qualifications as a vocational expert, [the heavy weight given the expert's
testimony] is impermissible." Id.

9

B.

This court has had, for some time, a generally liberal standard of qualifying experts. See, e.g., Paoli II, 35 F.3d at 741; Hammond v. International Harvester Co., 691 F.2d 646, 652–53 (3d Cir. 1982); Knight v. Otis Elevator Co., 596 F.2d 84, 87–88 (3d Cir. 1979). However, we have also set a floor with respect to an expert witness's qualifications. For example, in Aloe Coal Co. v. Clark Equipment Co. , 816 F.2d 110 (3d Cir. 1987), we held that a district court abused its discretion in allowing a tractor sales representative to testify as an expert regarding the cause of a tractor fire. See id. at 114. In making this determination we stated:

> Drewnoski [the expert witness] was not an engineer. He had no experience in designing construction machinery. He had no knowledge or experience in determining the cause of equipment fire. He had no training as a mechanic. He had never operated construction machinery in the course of business. He was a salesman, who at times prepared damage estimates.

Id. (citations omitted); see also Waldorf, 142 F.3d at 625 ("Even though we apply Rule 702 liberally, we have not pursued a policy of qualifying any proffered witness as an expert.").

Our decision in Waldorf provides guidance for our assessment of Copemann's qualifications. In Waldorf, the district court qualified an expert with credentials similar to Copemann's, and we affirmed that decision on appeal:

> The district court qualified Rizzo [the putative expert] to testify as a vocational expert in spite of his lack of any formal training in that field, and notwithstanding that his educational training culminated in a master's degree in sociology and social organization from Rutgers University in 1973. . . .
>
> . . . In 1991, he became involved in the Council's administration of a million dollar loan pool to assist disabled New Jersey residents in starting their own businesses. In that capacity, Rizzo evaluated the capacity of disabled individuals to accomplish specific

10

employment opportunities. Rizzo also testified that, through the course of his employment, he became familiar with studies on the work that quadriplegics can perform. Furthermore in his job experience, Rizzo utilized the New Jersey Department of Labor Statistics and the New Jersey Job Listing Book, which indicate employment opportunities available in various job categories in New Jersey. Thus, based on his experience and his familiarity with the literature in the field, the district court held that Rizzo was qualified properly as a vocational expert. The court said that "[w]hile his formal credentials may be a little thin, he certainly had sufficient substantive qualifications to be considered an expert under the liberal standard of Rule 702.

Id. at 626 (citations omitted).

What drove the Waldorf panel's decision to affirm on this issue was not the impressiveness of Rizzo's credentials or experience, but the standard of review governing our review of Rule 702 qualification rulings:

Waldorf has a heavy burden in challenging this decision because, absent an abuse of discretion, we will not substitute our own judgment for that of the trial court regarding the admission or exclusion of expert testimony. Of course, an abuse of discretion means much more than that the appellate court disagrees with the trial court. Rather, a trial court's determination whether to admit or exclude expert testimony will be upheld "unless manifestly erroneous."

. . . Even though Rizzo did not possess formal academic training in the area of vocational rehabilitation, he did have experience in the field through his employment at the Developmental Disabilities Council in attempting to provide jobs for disabled individuals. During this time, Rizzo also became familiar with the relevant literature in thefield. Even if his qualifications are, as the district court described, "a little thin," he has substantially more knowledge than an average lay person regarding employment opportunities for disabled individuals. In

11

> the circumstances, we cannot say that the district
> court abused its discretion in determining that Rizzo
> possessed the minimum qualifications necessary to
> testify as an expert.

Id. at 626-27 (citations omitted).

Copemann, like Rizzo, has no formal training in vocational rehabilitation and Elcock must therefore rely on Copemann's practical experience to demonstrate that he "possessed the minimum qualifications necessary to testify as an expert." Id. at 627. In support of Copemann's qualifications, Elcock points to Copemann's experience in helping drug addicts return to employment and to his work with the Virgin Islands Division of Workers' Compensation. Based on this background, one can presume that Copemann has learned about the difficulties disabled individuals face in employment, and has accumulated some experience in evaluating whether they can return to a particular job. Nonetheless, the most fundamental problem with Copemann's experience in this area is that he seems most qualified to testify on a micro-level regarding the ability of a disabled individual to return to a specific job; he does not appear particularly qualified to testify on the macro-level regarding the number of jobs in the national or local economy that the disabled individual is able to perform.

On the other hand, Copemann claims to have kept abreast of the relevant literature in his field, and to have consulted the Dictionary of Occupational Titles, a standard tool of the vocational rehabilitationist.4  In addition, Copemann possesses a degree in a field tangentially related to the one about which he testified, and he has also attended conferences regarding vocational rehabilitation. Finally, in the process of testifying as an expert in similar matters, Copemann has no doubt performed his brand of

_____

4. The DOT describes "the majority of occupations" in the economy, 1 U.S. Dep't of Labor, Dictionary of Occupational Titles iii (4th ed. 1991) (Message from the Secretary of Labor), as well as the hazards accompanying those jobs, see, e.g., Adorno v. Shalala, 40 F.3d 43, 47 (3d Cir. 1994), and is often used by vocational rehabilitationists to assess what jobs are available to disabled employees.

vocational rehabilitation assessments.5  Though his efforts in this regard are not grounded in formal training, when taken together with his review of the literature in the field and his attendance at conferences, we must acknowledge that he has "substantially more knowledge than an average lay person regarding employment opportunities for disabled individuals." Id. at 627.

We consider Waldorf to be at the outer limit of this court's generally liberal approach to reviewing the qualifications of experts. We also suspect that, had the district court in Waldorf ruled the witness unqualified, the panel would have affirmed. While Copemann seems but marginally qualified to perform a vocational rehabilitation assessment, and a district judge would be free to decline to qualify him, we recognize that Copemann's qualifications fall within Waldorf's outer bounds. Despite misgivings, because we are not prepared to say that the District Court, acting "on the spot" and exercising considerable care in its approach to this question, abused its discretion, we will affirm the Court's decision to qualify Copemann as an expert. We note, however, that the marginal nature of Copemann's qualifications does enter into the Daubert calculus, to which we now turn.

III. The Daubert Reliability of Copemann's Testimony

During trial and again on appeal, Kmart sought to exclude Copemann's testimony on the ground that his methodology for rendering vocational disability assessments was unreliable. Kmart repeatedly requested that the District Court conduct a Daubert hearing regarding Copemann's methods as a vocational rehabilitationist. The District Court

_____

5. We note that the mere fact that Copemann was previously admitted as an expert witness qualified to give testimony on vocational rehabilitation is irrelevant to the determination whether he is qualified to give such testimony in this case. See Thomas J. Kline, Inc. v. Lorillard, Inc., 878 F.2d 791, 800 (4th Cir. 1989) ("[I]t would be absurd to conclude that one can become an expert simply by accumulating experience in testifying."). Moreover, while any expertise he may have gained in performing vocational rehabilitation assessments in these cases would be relevant, the crucible of litigation makes for a poor classroom.

13

denied this request, stating that it "didn't look at" Copemann's vocational rehabilitation opinion "as a Daubert issue." Although we hold that the District Court erred in not granting a Daubert hearing, we acknowledge that the Court's refusal to do so is understandable, as the Court's decision was rendered before the Supreme Court's opinion in Kumho Tire Co., Ltd. v. Carmichael, 526 U.S. 137 (1999), extended the rigorous gatekeeping function assigned to trial judges by Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993), to cases involving non-scientific testimony. See Kumho, 526 U.S. at 141.

A.

In Daubert, the Supreme Court directed district court judges to perform a screening function, to insure that evidence presented by expert witnesses is relevant, reliable, and helpful to the jury's evaluation of such evidence. See Daubert, 509 U.S. at 597. Our precedent initially limited Daubert's command to cases involving scientific testimony. For instance, in In re Unisys Savings Plan Litigation, 173 F.3d 145, 157 (3d Cir. 1999), cert. denied sub nom., Meinhardt v. Unisys Corp., 120 S. Ct. 372 (1999), we stated that non-scientific testimony (such as Copemann's)"does not fall within the scope of scientific testimony, and accordingly, it should not be tested by the particular standards required for testimony based on a particular scientific ethic." Id. at 157. It was not until Kumho Tire that the Supreme Court made clear that Daubert's gatekeeping obligation covered not only scientific, but also non-scientific, testimony. See Kumho Tire, 526 U.S. at 151 (rejecting the "Eleventh Circuit's holding that a trial judge may ask questions of the sort Daubert mentioned only where an expert `relies on the application of scientific principles,' but not where an expert relies `on skill- or experience-based observation' ") (citation omitted).

Although we would ordinarily review a district court's application of Rule 702, as well as the decision whether to grant a Daubert hearing, for abuse of discretion, see Kumho Tire, 526 U.S. at 142, 152, our standard of review is somewhat different in this case. Because we are evaluating the District Court's legal interpretation of a federal rule, our

14

review is plenary. See In re Paoli R.R. Yard PCB Litigation, No. 99–1692, 2000 WL 1137475, at *6 (3d Cir. Aug. 10, 2000). As will appear, a review of Copemann's vocational rehabilitation testimony demonstrates the significant reliability questions raised by his methodology and compels the conclusion that a Daubert hearing would have permitted a fuller assessment of Copemann's analytical processes and thus was a necessary predicate for a proper determination as to the reliability of Copemann's methods. See Padillas v. Stork-Gamco, Inc., 186 F.3d 412, 417–18 (3d Cir. 1999) (holding that the district court abused its discretion in excluding an expert's opinion without conducting an in limine hearing focused on the Daubert reliability of his testimony). "When a [district] court . . . misapprehends [the] bounds" of a federal rule, "it abuses its discretion." Id. (citing Koon v. United States, 518 U.S. 81, 100 (1996)); cf. Kumho Tire, 526 U.S. at 159 (Scalia, J., concurring) ("Though, as the Court makes clear today, the Daubert factors are not holy writ, in a particular case the failure to apply one or another of them may be unreasonable, and hence an abuse of discretion."). In fairness, we note that, because he was without the benefit of Kumho Tire, the District Judge understandably misapprehended the bounds of Rule 702's gatekeeping requirement. Kumho Tire, however, must be applied.

B.

An expert's opinion is reliable if it is " `based on the `methods and procedures of science' rather than on `subjective belief or unsupported speculation'; the expert must have `good grounds' for his or her belief." Paoli II, 35 F.3d at 742 (quoting Daubert, 509 U.S. at 589). In cases involving scientific testimony, "[the] inquiry into the reliability of scientific evidence . . . requires a determination as to its scientific validity." Id. (citation omitted).

"Daubert suggests several factors that a district court should take into account in evaluating whether a particular scientific methodology is reliable . . . ." Id. The factors that Daubert and this Court have already declared important include:

15

> (1) whether a method consists of a testable hypothesis;
> (2) whether the method has been subject to peer
> review; (3) the known or potential rate of error; (4) the
> existence and maintenance of standards controlling the
> technique's operation; (5) whether the method is
> generally accepted; (6) the relationship of the technique
> to methods which have been established to be reliable;
> (7) the qualifications of the expert witness testifying
> based on the methodology; and (8) the non-judicial
> uses to which the method has been put.

Id. at 742 n.8 (citing Daubert and United States v. Downing, 753 F.2d 1224, 1238-41 (3d Cir. 1985), as the source of those non-exclusive factors). We will henceforth refer to these factors as the Daubert factors.

Kumho Tire makes clear that this list is non-exclusive and that each factor need not be applied in every case. As noted above, it also resolves the question whether these same factors should be applied when testing the reliability of a non-scientific method:

> Daubert's gatekeeping requirement. . . . make[s] certain
> that an expert, whether basing testimony upon
> professional studies or personal experience, employs in
> the courtroom the same level of intellectual rigor that
> characterizes the practice of an expert in the relevant
> field. . . . [T]he trial judge must have considerable
> leeway in deciding in a particular case how to go about
> determining whether particular expert testimony is
> reliable. That is to say, a trial court should consider
> the specific factors identified in Daubert  where they are
> reasonable measures of the reliability of expert
> testimony.

Kumho Tire, 526 U.S. at 152; see also id. at 158-59 (Scalia, J., concurring) ("I join the opinion of the Court, which makes clear that the discretion it endorses--trial-court discretion in choosing the manner of testing expert reliability--is not discretion to abandon the gatekeeping function.").

Kmart accepts that vocational rehabilitation expertise flows from a valid non-scientific method; it disputes, however, the reliability of Copemann's particular

16

methodology. Kmart points to a number of instances in which application of the Daubert factors would weigh against the reliability of Copemann's methods.

1.

Kmart first contends that Copemann's method can be described, in essence, as an idiosyncratic or subjective judgment in which the result can neither be duplicated nor tested for validity (implicating by rough analogy, and for reasons explained below in this Section, the first and fourth Daubert factors, see Paoli II, 35 F.3d at 742 n.8). Given the lack of a Daubert hearing, we must turn to Copemann's trial testimony in order to identify and evaluate the processes Copemann employed in making the disability determination in Elcock's case. On direct examination, Copemann described his method for arriving at the 50 to 60 percent disability opinion he rendered:

> My vocational assessment consisted of testing Mrs. Elcock for intelligence level achievement, that is school level, getting a work history on her and then doing an analysis of the Dictionary of Occupational Titles aptitude testing on her, and then doing a search of the Dictionary of Occupational Titles.
>
> . . .
>
> [In addition to a clinical interview,] I performed the [Wechsler] Adult Intelligence Scale revised and she had an IQ of 98 which is in the normal or average range. And I also performed the wide range achievement test revised which indicated that she had a reading level of above 12th grade level, spelling level of beginning 10th grade, and an arithmetic level of ending 6th grade.
>
> . . .
>
> Then I performed the aptitude testing on her, and I think we need to, I need to explain the aptitude test. Each job in the United States is categorized in this Dictionary of Occupational Titles put out by the U.S. Department of Labor and the characteristics of those jobs. Those jobs are listed, characterized and listed for each job, and every job has a set of aptitudes that tells

17

you what is needed or what are needed in order to be able to do those jobs. And there are tests that you can give to determine what a person's aptitude are for doing a particular job.

Copemann further testified that he also assessed which jobs were available in the local job market by reviewing the job listings his office receives weekly from the Virgin Islands labor department, and by searching a database his office creates of jobs listed in the local newspapers within the prior two months. He then stated that he "took into consideration [Elcock's] physical injuries and. . . her psychological impairments," and, in sum, concluded that he "rated [Elcock's] capacity after [he] had done all the analysis as somewhere between 50 and 60 percent."

When asked by Elcock's counsel to describe his methodology, Copemann testified as follows:

> You take into comparison her education, her intelligence, her aptitude, her previous work experience and her medical injuries, what she says, she would like to do, what her desires are as a person, her temperaments, whether she likes working by herself or she likes working with groups of people, whether she likes working on detailed stuff or she doesn't like working on detailed things because those are important, and her limitations as she states them, not only the medical findings but her limitations as she states them. So when you take all of those things together the closest I could come to it as a 50 to 60 percent disability.
>
> . . .
>
> [What that disability means] is that she is at a disadvantage when she goes out into the labor market because she's going to be competing with healthier individuals and she's going to be competing with [non-]impaired individuals.

On cross-examination, Kmart made several attempts to have Copemann explain how he arrived at the 50 to 60 percent figure other than his ipse dixit statement that the consideration of these factors produced these numbers.

Kmart pointed out that, before trial, Copemann had diagnosed Elcock's disability at 50 to 75 percent, and asked him to explain the discrepancy. Other than to state that his initial "estimate was too broad," Copemann did not explain why the range changed by 15 percent. Though Kmart might have conducted a more thorough cross-examination of Copemann on this point, a Daubert hearing would have afforded a far greater opportunity to probe the particulars of how Copemann arrived at specific disabilityfigures, without running the risk of boring or "turning off " the jury. Moreover, because Copemann never explained his method in rigorous detail, it would have been nearly impossible for Kmart's experts to repeat Copemann's apparently subjective methods, or, in the nomenclature of Paoli II, to find that his "method consists of a testable hypothesis" for which there are "standards controlling the technique's operation." 35 F.3d at 742 n.8.

As suggested above, we can only roughly analogize to these two Daubert factors when reviewing the non-scientific evidence presented by Copemann. Vocational rehabilitation is a social science that does not exactly mirror the fundamental precepts of the so-called harder sciences. However, the gist of the above Daubert factors are nonetheless implicated in this case. Just as a scientist would want to duplicate the outcome when evaluating a colleague's claim that he had developed a technique for cold fusion, a vocational rehabilitationist assessing Copemann's disability determination would want to test the underlying hypotheses and review the standards controlling the technique's operation in an attempt to reproduce the results originally generated.

If such testing did not generate consistent results, Copemann's method would be exposed as unreliable because it is subjective and unreproducible. Moreover, without an inkling as to the standards controlling Copemann's method--i.e., how he excludes for other variables, such as Elcock's pre-existing injuries or job limitations--an expert trying to reproduce Copemann's methods would be lost. Because Elcock had neither the need nor the opportunity to test Copemann's methods in this manner, on the present record we conclude that the

19

first and fourth Daubert factors suggest that Copemann's method was unreliable and therefore his opinion would not "assist the trier of fact to understand the evidence or to determine a fact in issue . . . ." Fed R. Evid. 702.

2.

Kmart's second argument is based on the fact that Copemann admits that he employed an untested, novel method for performing vocational rehabilitation assessments that was based on an arbitrary admixture of two widely used methods. This contention implicates the fifth and sixth Daubert factors: "(5) whether the method is generally accepted; [and] (6) the relationship of the technique to methods which have been established to be reliable . . . ." Paoli II, 35 F.3d at 742 n.8.

Given the absence of a full Daubert hearing, our exposure to the mechanics of Copemann's admittedly unique methodological approach to vocational disability assessment is limited to the brief description Copemann offered at trial. On cross examination, Kmart asked Copemann to explain the basis of his method and how he arrived at a disability rating of 50 to 60 percent. Copemann testified as follows:

> I use a combination of the procedure recommended by Fields which is to look at level of preinjury access to the labor market and post injury access and the percentage and the difference between those percentages Fields says is the loss of jobs or the lost percentage.
>
> I also looked at which is what I normally do at the procedure recommended by Anthony Gamboa and he suggests that you look at all the factors involved in the client's analysis, injury, test results, psychological results, the client's statements, and so on, and then you as the clinician must make a, you as a vocational expert must make an estimate. And so what I do is I use Fields analysis as a starting point and then I revert to Gamboa to depart from Fields to come up with an estimate.

20

Kmart does not dispute that the Fields and Gamboa approaches are accepted methodologies in the vocational rehabilitation field; what it does challenge is Copemann's combination method. Each approach, taken in isolation, may very well contain sufficient analytical rigor to be deemed reliable. However, we are inclined to view Copemann's admittedly novel synthesis of the two methodologies as nothing more than a hodgepodge of the Fields and Gamboa approaches, permitting Copemann to offer a subjective judgment about the extent of Elcock's vocational disability in the guise of a reliable expert opinion.[6]

Moreover, like the plaintiff in Kumho Tire, Elcock not only failed to introduce evidence that the particular admixture of these two methods by Copemann was "generally accepted," as required by Daubert's fifth factor, but she also did not demonstrate that this hybrid approach bore a logical relationship to the Fields and Gamboa techniques, methods that had been "established to be reliable," as required by Daubert's sixth factor. Paoli II, 35 F.3d at 742 n.8. What is at issue here bears a remarkable similarity to the situation in Kumho Tire, in which the Court wrote that

> nor does anyone deny that, as a general matter, tire abuse may often be identified by qualified experts through visual or tactile inspection of the tire. As we said before, the question before the trial court was specific, not general. . . .
>
> The particular issue in this case concerned the use of Carlson's [the plaintiff 's expert] two-factor test and

---

6. An argument could perhaps be made that Copemann's method represents a cross-checking approach that applies the learning of two accepted methods. In different circumstances, we have opined that there is nothing wrong with cross-checking the results of two accepted methods to insure that the outcomes at which one is arriving are reliable. See Gunter v. Ridgewood Energy Corp. , No. 00-5053, 2000 WL 1038142, at *4 n.1 (3d Cir. July 27, 2000) (recommending that in awarding attorneys' fees "courts cross-check the percentage award at which they arrive against the `lodestar' award method"). We are doubtful that such a generous characterization is appropriate for Copemann's combination method, but the parties can seek to have that issue resolved at the Daubert hearing on remand.

21

his related use of visual/tactile inspection to draw conclusions on the basis of what seemed small observational differences. We have found no indication in the record that other experts in the industry use Carlson's two-factor test or that tire experts such as Carlson normally make the very fine distinctions about, say, the symmetry of comparatively greater shoulder tread wear that were necessary, on Carlson's own theory, to support his conclusions. Nor, despite the prevalence of tire testing, does anyone refer to any articles or papers that validate Carlson's approach. . . . . Of course, Carlson himself claimed that his method was accurate, but, as we [have] pointed out . . ., "nothing in either Daubert or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the ipse dixit of the expert."

526 U.S. at 156-57 (citations omitted). Elcock did not introduce evidence that Copemann's combination method was either used by other experts or even referenced in the vocational rehabilitation literature. Moreover, aside from the brief statement that he used the Gamboa approach to depart from the Fields approach, Copemann offered no explanation as to how his hybrid methodology could be rationally derived from the application of the two accepted techniques. Thus, we conclude that the fifth and sixth Daubert factors militate in favor of excluding Copemann's testimony.

3.

Third, Kmart points to Copemann's thin qualifications to cast doubt on the reliability of his vocational rehabilitationist opinion. As we made clear in Paoli II, an expert's "level of expertise may affect the reliability of the expert's opinion." 35 F.3d at 741; see also id. at 742 n.8 (listing this element as the seventh Daubert factor). In light of our substantial discussion in Section II explaining how Copemann's qualifications are marginal at best, and mindful of the District Court's statement that the question of Copemann's qualifications was a "close call," we believe

22

that this factor also weighs in favor of excluding Copemann's testimony.

4.

Finally, we note that Copemann's application of the hybrid method he describes appears unreliable on its face. On direct examination, Copemann testified that "with or without her disabilities," given the jobs available in the Virgin Islands, "the only job that [Elcock] could really possibly go back to do . . . if she gets motivated enough" would be with Mary Kay. "Given . . . her present condition," however, Copemann testified that Elcock is "[n]ot now [capable]" of meeting the requirements for work as a Mary Kay representative. If Copemann had actually employed the Fields method as he described it, Copemann would have had to conclude that Elcock was 100 percent disabled. According to Copemann, a vocational rehabilitationist employing the Fields methodology arrives at a job loss percentage by comparing the difference between "preinjury access to the labor market" and "post injury access." Taking Copemann's testimony at face value, Elcock was qualified for only one job in the Virgin Islands before her injury, and no jobs afterwards. As a matter of "percentage" her "loss of jobs" was 100 percent.

Copemann also said nothing to clarify why an application of the Gamboa method would have halved this disability estimate, as it must have if Copemann ultimately concluded that Elcock was between 50 and 60 percent disabled. Nor, looking at Copemann's description of his methodology, does it seem that a reasonable explanation could be provided. Given the disconnect between the stated nature of these methods and the results they produced when the facts of the instant case were plugged into their machinery, we hesitate to say that Copemann's method is a reliable one. Though this inconsistency would normally go to the weight a jury would give Copemann's testimony, in this case the discord is so stark that we factor it into our Daubert calculus. Perhaps this inconsistency could be sufficiently clarified, but at this juncture, a Daubert hearing is the proper forum for such an elucidation. Cf. Padillas, 186 F.3d at 418 (stating that a district court may abuse its

23

discretion in failing to conduct a Daubert hearing "when the ruling on admissibility turns on factual issues").

Thus, on balance, given the serious doubts raised by Kmart regarding Copemann's methods, and in light of Elcock's failure to adduce much evidence validating his methods, we feel compelled both to vacate the District Court's decision to admit Copemann's testimony and to remand for a Daubert hearing on this issue. We express no opinion as to the outcome of this hearing. On remand, Elcock will have an opportunity to substantiate the bases underlying Copemann's opinion, and Kmart will have an opportunity to impeach or undermine them.[7]

C.

Lastly, we offer some guidance for remand concerning the appropriate role that the challenge to Copemann's credibility is to play in the Daubert calculus. We note that in reaching our conclusion about the reliability of Copemann's methods, we do not consider evidence regarding Copemann's credibility, or his alleged character for untruthfulness.

During trial, in an effort to impeach Copemann's character for truthfulness and to blunt the force of his testimony, Kmart sought to question Copemann about the fact that he had engaged in acts of criminal misconduct involving dishonesty or false statements. Kmart offered to prove that Copemann and the corporation for which he served as chief executive officer, Caribbean Behavioral Institute, Inc. (CBI), had pled guilty to violating 18 U.S.C. S 641, which prohibits "embezzl[ing] . . . or knowingly converting to [one's] use . . . any property made or being made under contract for the United States . . . ." Kmart sought to question Copemann about the fact that he and CBI had misappropriated $331,000 from the federal government.

_____

7. We note that, on remand, the District Court need not conduct a Daubert hearing regarding Copemann's ability to testify regarding Elcock's psychological harms. The parties do not contest his qualifications to render, or his methods for rendering, such an opinion.

24

The fact that Copemann and CBI pled guilty to embezzlement and knowing conversion of federal property arguably casts doubt on his credibility as a witness, and could--under an overly expansive reading of our jurisprudence--be an appropriate Daubert factor to weigh when adjudging reliability. In In re Unisys Savings Plan Litigation, 173 F.3d 145 (3d Cir. 1999), cert. denied sub nom., Meinhardt v. Unisys Corp., 120 S. Ct. 372 (1999), over a strong dissent by the author of this opinion, a panel of this court affirmed a district court's decision not to admit the testimony of an expert witness, based in part on the fact that the district court found the expert to be not credible. See id. at 158. In support of its conclusion, the majority contended that the district court could properly take into account the expert witness's credibility--and was not limited to assessing the reliability of the expert's methodology under the Rule 702 Daubert framework-- because the expert's "testimony [did] not fall within the scope of scientific testimony, and accordingly, it should not be tested by the particular standards required for testimony based on a particular scientific ethic." Id. at 157 (second emphasis added).

Insofar as In re Unisys relied on the now-rejected distinction between scientific and non-scientific testimony, this part of the majority's opinion was cast into doubt by Kumho Tire. Moreover, In re Unisys explicitly limited its holding to bench trials, in which "the role of the gatekeeper to admit or exclude evidence . . . and the role of the fact finder to assess and weigh the evidence that was admitted . . . are one and the same . . . ." 173 F.3d at 158. The case at bar was not a bench trial and thus, even assuming that In re Unisys's holding is still good law, Copemann's credibility is and was an issue solely within the province of the jury that could neither be considered by the District Court when performing its Rule 702 analysis, nor by this Court in reviewing that analysis. We thus decline to apply In re Unisys here. On remand, therefore, the District Court should not consider Copemann's likely credibility as a witness when assessing the reliability of his methods.8

_____

8. We note, in addition, that In re Unisys 's holding regarding the ability
of a trial court to factor credibility into the reliability analysis--
especially

25

IV. The Scope of Kmart's Cross-Examination
      Regarding Copemann's Character for
      Untruthfulness

The fact that Copemann and CBI pled guilty to violating
18 U.S.C. S 641 became an issue in the litigation between
Elcock and Kmart in another respect. During trial, Kmart
sought to introduce evidence (i) of the fact that Copemann
and CBI had pled guilty to violating 18 U.S.C. S 641, and (ii)
that would provide further details about Copemann's and
CBI's misconduct, including the fact that their crime
consisted of misappropriating $331,000 from the federal
government. Kmart also wanted to cross-examine
Copemann based on the extensive findings of fact made by
the District Court in describing Copemann's and CBI's
misdeeds when sentencing the two in the S 641
prosecution. See United States v. Caribbean Behavioral
Inst., Crim. No. 99-0012, at 1-14 (D.V.I. Aug. 15, 1997).
However, in ruling on an in limine motionfiled by Elcock,
the District Judge, who also presided over the criminal case
against Copemann, forbade questions regarding the amount
that Copemann and CBI had embezzled, as well as about
the facts and circumstances underlying these crimes,
holding that such questions would be cumulative and
would add nothing to Kmart's attempt to impeach
Copemann's veracity. See Elcock v. Kmart Corp. , Civ. No.
1996-0028F, at 5 (D.V.I. Sept. 23, 1997).

Neither party contests the District Court's admission of
the pleas. Rule 609(a)(2) provides that "evidence that any
witness has been convicted of a crime shall be admitted if
it involved dishonesty or false statement, regardless of the
punishment." Fed. R. Evid. 609(a)(2) (emphasis added). A
violation of 18 U.S.C. S 641 is a crime of dishonesty
because it involves the embezzlement of money. See Fed. R.
Evid. 609 advisory committee notes (1990 Amendment)
_____

when it involves the use of a prior conviction to make an ad hominem
attack on witnesses' believability--has been questioned by at least one
prominent evidence commentator. See Edward J. Imwinkelried, Trial
Judges--Gatekeepers or Usurpers? Can the Trial Judge Critically Assess
the Admissibility of Expert Testimony Without Invading the Jury's
Province to Evaluate the Credibility and Weight of the Testimony, 84
Marq. L. Rev. (forthcoming Fall 2000).

(noting that the House and Senate Conference Committee debating Rule 609 stated that " `[b]y the phrase "dishonesty and false statement," the Conference means crimes such as . . . embezzlement' "), reprinted in Federal Civil Judicial Procedure and Rules 389 (West 2000). The District Court thus followed Rule 609(a)(2)'s mandate when it admitted evidence of Copemann's and CBI's guilty pleas for crimes involving dishonesty.

The District Court's discretion to exclude the challenged questions regarding the specific acts of misconduct underlying these pleas reposes in Rule 608(b). Pursuant to that Rule, which is rescribed in the margin, the specific acts of misconduct about which Kmart attempted to cross-examine Copemann are permissible lines of inquiry to impeach a witness's character for truthfulness, but only at the discretion of the district court.9  The advisory committee notes to Rule 608(b) recognize that, in addition to the terms of Rule 608(b), Rules 403 and 611 govern this discretionary authority. See Fed. R. Evid. 608(b) advisory committee notes (1972 Proposed Rules; Note to Subdivision (b)), reprinted in Federal Civil Judicial Procedure and Rules 383 (West 2000).

Elcock does not contend that Rule 608(b), by its terms, mandates the exclusion of this evidence. Instead, she rests her argument on the discretion of the District Court to forbid lines of inquiry permissible under Rule 608(b). Accordingly, as did the District Court, we turn to Rules 403 and 611. Rule 403 provides that relevant "evidence may be

_____

9. The Rule, in pertinent part, provides:

        (b) Specific instances of conduct. Specific instances of the conduct
        of a witness, for the purpose of attacking or supporting the witness'
        credibility, other than conviction of crime as provided in rule 609,
        may not be proved by extrinsic evidence. They may, however, in the
        discretion of the court, if probative of truthfulness or untruthfulness,
        be inquired into on cross-examination of the witness (1) concerning
        the witness' character for truthfulness or untruthfulness, or (2)
        concerning the character for truthfulness or untruthfulness of
        another witness as to which character the witness being cross-
        examined has testified. . . .

Fed. R. Evid. 608(b) (emphasis added).

27

excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Rule 611 instructs district courts to"exercise reasonable control over the mode and order of interrogating witnesses and presenting evidence so as to . . . avoid needless consumption of time." As noted above, the District Court excluded the proffered specific-acts line of inquiry beyond questions relating to the Copemann's and CBI's guilty pleas and the elements of those offenses, because inquiries into the facts underlying those crimes would have been cumulative and would have "provide[d] little further assistance to the jury in evaluating Dr. Copemann's credibility." Elcock v. Kmart Corp., Civ. No. 1996-0028F, at 5 (D.V.I. Sept. 23, 1997). We review this decision for abuse of discretion. See Becker v. ARCO Chem. Co., 207 F.3d 176, 180-81 (3d Cir. 2000).

The amount of money that Copemann and CBI misappropriated and the exact way in which they did so is certainly relevant to prove the extent of Copemann's dishonesty. A juror could rationally conclude that one who embezzles a million dollars from the Government over a long period of time has a worse character for veracity than a person who steals five dollars once. Cf. United States v. Geevers, No. 99-5155, 2000 WL 1171976, at *7 (3d Cir. Aug. 18, 2000) ("We think that a defendant who falsifies checks for large sums of money is more culpable than one who does so for lesser sums."). To the extent that they paint Copemann's crimes in a more accurate and complete manner (as the District Judge did in his sentencing opinion), questions relating to the facts underlying the pleas are also more probative of untruthfulness than a bland reference to a United States Code section or a recitation of the crime's elements.10

_____

10. The criminal statute under which Copemann and CBI were convicted, 18 U.S.C. S 641, states:

> Whoever embezzles, steals, purloins, or knowingly converts to his
> use or the use of another, or without authority, sells, conveys or
> disposes of any record, voucher, money, or thing of value of the

28

In reviewing the trial court record, it is apparent that the extent and nature of Copemann's criminal misdeeds were somewhat blunted by the fact that Kmart could not ask Copemann about the amount of money stolen or the lengths to which Copemann went to misappropriate these funds. Thus, were we acting as the trial court in the case at bar, we likely would have admitted some of this additional evidence. However, it was well within the District Court's discretion to reach the conclusion it did, as that decision was certainly rational and consistent with the terms of Rules 403 and 611. The chief probative force of the guilty pleas was the fact that Copemann and CBI committed crimes of dishonesty, and this evidence came out during trial. Filling in the details surrounding these crimes would doubtless have taken a fair bit of trial time, and would have been cumulative insofar as doing so would only result in proving the same points--i.e., that Copemann has a character for being untruthful and his expert opinions should not be believed. The District Judge, having presided over the criminal case, was familiar with the complexity of the facts vel non surrounding these crimes, and likely had a better sense than we do of what this line of inquiry would have entailed.

We give "substantial deference" to evidentiary rulings under Rule 403 and other similarly discretionary evidentiary rules. Hurley v. Atlantic City Police Dep't, 174 F.3d 95, 110 (3d Cir. 1999), cert. denied, 120 S. Ct. 786 (2000). Abiding by this standard, we hold that the District Court did not abuse its discretion under Rules 403 and 611 in permitting Kmart to question Copemann only about the United States Code section of the crime to which he and

---------------------------------------------------------------

United States or of any department or agency thereof, or any property made or being made under contract for the United States or any department or agency thereof . . .

. . .

[s]hall be fined under this title or imprisoned not more than ten years, or both; but if the value of such property does not exceed the sum of $1,000, he shall be fined under this title or imprisoned not more than one year, or both.

29

CBI entered guilty pleas, as well as the elements of that offense.11 We note that during the retrial of the damages issue on remand, Kmart is free to try to pursue its more expanded line of inquiry, and the District Court is concomitantly free to forbid such questions for the same reasons it did so before.

V. The Evidentiary Issues Relating to
Pettingill's Testimony

Pettingill, an economist, testified on Elcock's behalf regarding her economic losses. He prepared an economic damages model that relied on several empirical assumptions about the extent of Elcock's injuries, her earning capacity before and after the accident, and her life expectancy. Kmart challenged each of these assumptions before the District Court, and raises those objections again on appeal. Kmart, in essence, argues that Pettingill inflated each of these figures in rendering his expert opinion, and in doing so, rested his damages opinion on assumptions wholly lacking foundation in the record. We review the District Court's decision to admit Pettingill's testimony for abuse of discretion.

_____

11. Judge Garth does not agree with the majority of the panel that the District Court properly exercised its discretion in limiting Kmart's cross-
examination of Copemann. Copemann had pled guilty to violating 18 U.S.C. S 641 (rescribed in the margin at footnote 10). The extent of Copemann's crime was found to be $331,513. Kmart was prevented from bringing this fact to the attention of the jury when it cross-examined Copemann. Nor could Kmart examine Copemann about the conveyance and the disposal of those moneys, all of which was accomplished without authority.

As the majority acknowledges, the facts underlying a plea are more probative of untruthfulness than merely a recitation of a violation of a United States Code section or a recitation of the particular crime's elements. While Judge Garth agrees that the District Court is entitled to deference when it exercises its discretion, he is of the view that, in this
instance, the District Court abused its discretion by restricting the cross-examination of Copemann to the extent that it did. He would so hold.

A.

We have held that "[a]lthough mathematical exactness is not required, [expert] testimony of post-injury earning capacity must be based upon the proper factual foundation." Benjamin v. Peter's Farm Condominium Owners Ass'n., 820 F.2d 640, 643 (3d Cir. 1987). Put another way, an "expert's testimony [regarding future earnings loss] must be accompanied by a sufficient factual foundation before it can be submitted to the jury." Gumbs v. International Harvester, Inc., 718 F.2d 88, 98 (3d Cir. 1983). In both Benjamin and Gumbs, we held that an expert's lost future earnings opinion was too speculative to be presented to the jury. In Benjamin, the expert relied solely on the plaintiff 's personal assessment of his ability to re-enter the work force in assuming that the injured plaintiff would make only $10,000 a year as a result of the injuries he sustained. 820 F.2d at 642-43. We held that this assumption, absent "sufficient factual predicates," id. at 642, was a "castle made of sand," id. at 643 (internal quotation marks omitted). In so doing, we set aside a jury verdict for the plaintiff, because the district court failed to exclude the expert opinion that relied on this flawed assumption. See id.

In Gumbs, we held similarly. The expert in Gumbs "calculated the plaintiff 's future earnings loss based on plaintiff 's remaining life expectancy of eighteen years rather than plaintiff 's remaining work-life expectancy of seven and one-half years." 718 F.2d at 98. The expert also assumed that, but for his accident, the plaintiff would in the future earn twice his average annual income for the four years preceding the accident, as well as receive "$1700 in annual fringe benefits even though there was no evidence that the plaintiff had ever received fringe benefits in the past." Id. Reversing on other grounds, we stated that, on remand, the expert could not include these assumptions in his testimony before the jury, unless the assumptions were "accompanied by a sufficient factual foundation. . . ." Id.12

_____

12. Other Courts of Appeals have similarly excluded expert opinions not grounded in the facts of a case. See, e.g., Quinones-Pacheco v. American Airlines, Inc., 979 F.2d 1, 6 (1st Cir. 1992) ("Because [the expert's]

31

B.

Turning to the facts of this case, we must examine the disputed assumptions that Pettingill used in arriving at his lost economic opportunities opinion. Pettingill testified that, in preparing his economic damages model on Elcock's behalf, he had received a copy of Copemann's report, which presumably described Elcock as either 50 to 60 or 50 to 75 percent disabled. Nonetheless, Pettingill assumed that Elcock was 100 percent disabled when arriving at his opinion. Pettingill also testified that he was familiar with Elcock's past earnings, which were relatively meager. Elcock's husband had testified that she worked fourteen hours a day as a Mary Kay representative, and the record shows that she earned $5,774 in 1995 (before the injury) and $1,070 in 1996 (after the injury). Pettingill nevertheless assumed, in rendering his opinion, that Elcock would have made $6 an hour, working 40 hours a week. Thosefigures indicate that Pettingill presumed that Elcock would have made a $12,480 a year but for her 100 percent disability, more than twice her pre-injury earnings. Pettingill also did not discount for the $1,070 that Elcock was still able to earn even with her injury. Moreover, although Pettingill at one point did suggest that the jury could discount from his 100 percent disability figure so as to take account of the possibility that Elcock was not completely disabled, Pettingill persisted in employing the 100 percentfigure.

As did the experts' assumptions in Benjamin and Gumbs, Pettingill's assumptions in the instant case lack foundation in the record. Though in supplemental post-appellate oral argument briefing Elcock has pointed out the fact that in the past she had worked, inter alia, as a pastry chef and a baker making more than $9 an hour, the underlying data

_____

analysis was predicated on an assumption not supported by the record--the assumption that [the plaintiff] suffered from a permanent, total disability--the district court did not err in excluding the proffer."); In re
Air Crash Disaster at New Orleans, La., 795 F.2d 1230, 1233 (5th Cir. 1986) ("We find the economist's `opinion' that the collective loss of inheritance for the three children was $1,778,873 to be completely airborn[e], premised as it was on assumptions without basis in the real world of [the decedents].").

supporting these assertions was not part of the trial record. Rather, Elcock failed to adduce evidence at trial (or at any time before the District Court) laying a foundation for the fact that she could have obtained employment at those wages in the Virgin Islands before her injuries. Thus, the assumption that Elcock could have earned over $12,000 a year when she had only made $5,774 in the year of her injury should have been excluded for lack of foundation.

The same can be said of Pettingill's failure to take into account the fact that Elcock continued to earn money as a Mary Kay salesperson after her injury. According to Elcock's tax records, she earned $1,070 in 1996, the year after her slip and fall. Pettingill ignored these more concrete numbers rooted in the record, which suggest that Elcock was not completely disabled, in favor of his arbitrary 100 percent disability figure. He made similarly questionable assumptions about Elcock's life expectancy. In constructing his damages model, Pettingill assumed that Elcock would live and work to the average retirement age expected of African American females. He did not adjust this estimate to reflect the fact that Elcock's own expert, Payne, testified that Elcock's poorly controlled diabetes could cut her life span--and perhaps her working life--short. Ignoring "the real world of " Carmelita Elcock renders Pettingill's opinion inadmissible.

In sum, we believe that Pettingill's economic damages model relied on several empirical assumptions that were not supported by the record. Although Pettingill suggested to the jury that it might discount the 100 percent disability figure that he plugged into his economic model, this suggestion is not sufficient to change the result. In the absence of clearer instructions or emphasis by the witness or the court, a jury is likely to adopt the grossfigure advanced by a witness who has been presented as an expert. Accordingly, the District Court abused its discretion in admitting Pettingill's model as evidence. Cf. Benjamin, 820 F.2d at 643; Gumbs, 718 F.2d at 98. 13
(Text continued on page 35)

_____

13. Interestingly, though the foundation requirement for expert testimony is well developed in the case law and in the experience of trial lawyers and judges, neither our opinions in Gumbs and Benjamin nor the

33

evidence treatises themselves expressly ground this requirement in one of the Federal Rules of Evidence or in the legislative history or advisory committee notes accompanying the Rules. Like the case law and trial practice governing cross-examination for bias, see United States v. Abel, 469 U.S. 45, 49 (1984), the foundation requirement is a rule of evidence that can only be found in the interstitial gaps among the federal rules.

In these terms, Article VII would likely be the best source for the rule, as it governs and is titled "Opinions and Expert Testimony." Rules 702 and 703 bear on foundation analysis, but neither Rule addresses it in explicit terms; nor do the advisory committee notes accompanying the Rules. Nonetheless, a lost future earnings expert who renders an opinion about a plaintiff 's future economic harm based on economic assumptions not present in the plaintiff 's case cannot be said to "assist the trier of fact," as Rule 702 requires. This type of an opinion misleads the fact-finder and arguably does not comply with the "fit" requirement of that Rule. See supra Section II.A (discussing this requirement); see also 2 Stephen A. Saltzburg, Michael M. Martin & Daniel J. Capra, Federal Rules of Evidence Manual 1272-75 (7th ed. 1998) (detailing Rule 702 and collecting cases in which courts have excluded expert testimony from economists because their damages models did notfit with the facts in evidence).

Rule 703 embodies a similar requirement, which does not clearly set forth the foundation rule used in Gumbs and Benjamin, but which does bear on the analysis inhering in those cases. Rule 703, titled "Bases of Opinion Testimony by Experts," provides that

> [t]he facts or data in the particular case upon which an expert bases
> an opinion or inference may be those perceived by or made known
> to the expert at or before the hearing. If of a type reasonably relied
> upon by experts in the particular field in forming opinions or
> inferences upon the subject, the facts or data need not be
> admissible in evidence.

While these limitations and the notes accompanying them do not specifically address the exclusion of expert testimony based on assumptions lacking a foundation in the record, it is not a stretch from the requirement that other "experts in the particular field" would "reasonably rel[y]" on such data in"forming opinions . . . on the subject," id., to suggest that an expert should not depend on fictional or random data when rendering an opinion about the quantum of economic harm in a particular plaintiff 's case. Cf. Saltzburg, supra, at 1397-99 (discussing Rule 703 and collecting cases in which courts have excluded

34

VI. The Jury's Award

Kmart challenges the jury's $650,000 damage award on two grounds. First, Kmart contends that Elcock failed to adduce evidence sufficient to support a jury'sfinding that her slip and fall caused her permanent injuries. Second, Kmart argues that both the economic and non-economic awards were excessive and should be remitted.

A.

In asserting that Elcock failed to establish causation with respect to her permanent injuries, Kmart points primarily to inconsistencies in the testimony of Payne, who was Elcock's principal witness on permanence, concerning the location of trigger points. On direct examination, Payne testified that, as a result of her fall, Elcock suffered permanent injuries to her back and legs, including trigger points in the gluteus maximus that caused pain to radiate

_____

expert testimony because the experts unreasonably relied on underlying data that was too speculative or not introduced into evidence). Indeed, the very title of Rule 703 supports its applicability to foundation generally.

Undergirding for Gumbs's and Benjamin 's foundation rule can also be found in Article IV of the Rules of Evidence. Rule 402 sets forth a liberal admissibility standard for "[a]ll relevant evidence," defined in Rule 401 as "evidence having any tendency" to make "more probable or less probable" the existence "of any fact that is of consequence to the determination of the action." Under this framework, an economist's testimony concerning a reliable method for assessing future economic losses can be deemed relevant only insofar as a jury can usefully apply that methodology to the specific facts of a particular plaintiff 's case. Moreover, Rule 403 grants to the district court the discretion to exclude relevant evidence "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury." Given the realities of litigation, the opinion of a witness impressed by the court with the label of "expert" may carry a great deal of weight with a lay jury, particularly in matters as complex as lost future earnings assessments. Permitting such a witness to offer an opinion unsupported by a sufficient factual foundation would significantly increase the risk of misleading the jury and confusing the issues, the very dangers against which Rule 403 defends.

to her right knee. On cross examination, Kmart impeached Payne's testimony by forcing her to admit that, according to the leading treatise on the subject, pain caused by trigger points in the gluteus maximus would not travel below the thigh. Payne acknowledged that her original diagnosis was mistaken, but responded by clarifying that Elcock's trigger points were in fact situated on the dividing line between the gluteus maximus and gluteus medius muscles. Parsing this testimony, Kmart contends that Payne has not offered an opinion as to causation based on the revised trigger point placement, and therefore, that Elcock has failed to produce sufficient evidence to support a conclusion that her slip and fall caused her permanent injuries.

However, Kmart has ignored the fact that Payne testified on redirect examination that her misplacement of trigger points did not affect either her opinion regarding the permanence of Elcock's injuries or her conclusion that Elcock's slip and fall at Kmart caused those harms. Thus, while Kmart's cross examination may have poked some holes in Payne's trigger point diagnosis, Payne did reaffirm her opinion as to the permanence and cause of Elcock's injuries. In making its determination as to causation, the jury apparently credited Payne's testimony, as it was entitled to do. We will not disturb that conclusion.

B.

Kmart also argues that both the economic element of the jury's damage award, which includes a recovery for lost earnings and lost earning capacity, and the non-economic component, which includes a recovery for pain and suffering, were excessive and should have been remitted. We need not reach Kmart's remittitur argument, however, as we remand for a new trial on the issue of damages. Our discussion of the defects in Copemann's and Pettingill's testimony sufficiently demonstrates the need for a retrial of economic damages. Whether the new trial on remand must also extend to the non-economic portion of the jury's damage verdict presents a closer question.

A partial new trial "may not properly be resorted to unless it clearly appears that the issue to be retried is so

36

distinct and separable from the others that a trial of it alone may be had without injustice." Vizzini v. Ford Motor Co., 569 F.2d 745, 760 (3d Cir. 1977) (quoting Gasoline Prods. Co., Inc. v. Champlin Refining Co., 283 U.S. 494, 500 (1931)). The grant of a partial new trial is appropriate "only in those cases where it is plain that the error which has crept into one element of the verdict did not in any way affect the determination of any other issue." Romer v. Baldwin, 317 F.2d 919, 922-23 (3d Cir. 1963) (citation and quotation marks omitted). Having looked at the manner in which evidence of Elcock's damages was presented at trial, we must acknowledge the possibility that the jury did not keep the award of non-economic damages distinct and separate from the award of economic damages.

For instance, at trial, Copemann offered not only an opinion as to Elcock's vocational disability, the basis of her recovery for lost earnings and lost earning capacity, but also testified about the extent of Elcock's psychological and physical injuries, a principal factor in her pain and suffering award. In light of Copemann's testimony, the jury may have considered it appropriate to base its pain and suffering award in part on evidence of Elcock's lost earning capacity. There are other possible areas of overlap. Both Copemann and Pettingill opined that Elcock was substantially, if not completely, impaired in her ability to work. Pettingill's lost earnings model assumed that Elcock was 100 percent disabled, and Copemann specifically noted that, following her injury, Elcock was no longerfit for the one job for which she was qualified. From these opinions of complete disability, the jury may have inferred that Elcock suffered a significant loss in her enjoyment of life, and increased her non-economic damage award accordingly.

Because we cannot confidently conclude that theflaws in Elcock's evidence of economic damages did not affect the jury's determination of her non-economic damages, the general presumption against partial new trials recognized in Vizzini and Romer guides our decision. We therefore hold that a new trial must be had on the entire damage issue.14

_____

14. Given the fact that Kmart has conceded its liability, the new trial on remand need not include the liability issue.

VII. Conclusion

For the foregoing reasons, the judgment of the District
Court will be affirmed in part and reversed in part, and the
case remanded for a new trial on the issue of damages.
Parties to bear their own costs.

A True Copy:
Teste:

       Clerk of the United States Court of Appeals
       for the Third Circuit